**SIGNED THIS: June 10, 2011**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DANNY S. EDWARDS and | ) | Case No. 09-83881 |
| DOROTHY E. EDWARDS, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| NORTHWEST BANK & TRUST COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 10-8029 |
| | ) | |
| DANNY S. EDWARDS and | ) | |
| DOROTHY E. EDWARDS, | ) | |
| | ) | |
| Defendants. | ) | |

### O P I N I O N

The matter is before the Court after trial on the sole issue of whether the Debtors intended to deceive Northwest Bank & Trust Company (NORTHWEST) on its complaint seeking a determination of nondischargeability of a debt resulting from a consent judgment

entered in state court proceedings on May 24, 2007, against the Debtors, Dorothy E. and Danny S. Edwards (together, the DEBTORS).

In 2004, Dorothy was the President and sole shareholder of My Type, Inc. (MY TYPE), a corporation whose main business was acting as a distribution agent for DHL Express. Danny was an officer of the corporation and served in a management capacity. The DEBTORS sought both personal financing and financing for MY TYPE from NORTHWEST in the summer of 2004, submitting a personal financial statement dated July 22, 2004. The personal financial statement valued MY TYPE at $1,000,000. Beginning in September, 2004, and continuing through the spring of 2005, NORTHWEST made several loans to MY TYPE, Dorothy and Danny. MY TYPE granted a blanket security interest in its assets to NORTHWEST to secure the loans and the DEBTORS' loans were secured by a first mortgage on real estate at 1143 - 15th Avenue, East Moline, the business property of MY TYPE. The loans made to MY TYPE were guaranteed by the DEBTORS and the loans to the DEBTORS were guaranteed by MY TYPE. MY TYPE encountered financial difficulties and filed a Chapter 11 petition on June 30, 2005.[1]

On August 1, 2005, three of MY TYPE'S loans were rewritten. No new money was advanced. In connection therewith, a second personal financial statement, signed only by Dorothy and dated May 19, 2005, was submitted to NORTHWEST. MY TYPE'S Schedule E, filed on August 11, 2005, scheduled the Internal Revenue Service (IRS) as holding a priority claim of $238,745.42, for 941 taxes for 2004, explaining the liability as "Withholding

---

[1]Case No. 05-83236.

Tax, was a reporting error and IRS returned the tax payment prior to the liability being posted with the IRS." The IRS was also scheduled as holding priority claims for withholding tax for the second quarter of 2005 in the amount of $53,702.31 and in the amount of $97.62 for 1995.

On October 27, 2005, the IRS filed a claim for withholding taxes for the tax period ending March 31, 2004, in the amount of $189,232.58, as secured, and for the tax period ending June 30, 2005, in the amount of $37,919.25, as a priority. According to the proof of claim, WT-FICA taxes for the first quarter of 2004 in the amount of $157,312.43 were assessed against MY TYPE on July 19, 2004. The taxes for the second quarter of 2005 were assessed on September 19, 2005. According to the IRS Notice of Tax Lien attached to the proof of claim, as of October 4, 2004, the unpaid balance for the 941 taxes for the first quarter of 2004 was $238,695.26.[2] The Notice provides that it was prepared and signed on October 4, 2004 and received by the Secretary of State on October 12, 2004.

On December 12, 2005, nearly six months after the filing of the Chapter 11 petition, NORTHWEST filed an "emergency" motion to prohibit MY TYPE'S use of cash collateral, seeking an order providing for the segregation of accounts receivable, a replacement lien on new receivables and retroactive adequate protection payments of $13,500 to be made in September, October and November, 2005. The Court denied the motion after a hearing, ruling that NORTHWEST'S motion came too late, as the accounts receivable existing on the

---

[2] No evidence was presented as to how this amount was calculated or why this amount is significantly larger than the tax liability for the same period reflected on the proof of claim. None of the differences in amounts as between MY TYPE'S schedules, the IRS claim, and the attachments was explained.

date the petition was filed had already been collected and used to pay expenses, in the ordinary course of operations. The Court did, however, afford NORTHWEST an opportunity to trace the proceeds of the prepetition accounts into the current receivables. *See In re Skagit Pacific Corp.*, 316 B.R. 330 (9th Cir.BAP 2004). NORTHWEST, however, was unable to do so.

On January 20, 2006, MY TYPE filed a plan and disclosure statement, which provided the following with respect to IRS'S claim:

> The debtor in possession had negotiated a pre-petition agreement with the IRS for payments of $2500.00 per month. An initial lump sum payment of $50,000 was paid to the IRS on November 3, 2004, and the negotiated repayment plan began in December of 2004. My Type has consistently paid these payments since that time. Debtor will continue to pay pre-confirmation such amounts, and continue to pay such amounts as Plan payments thereafter until the secured and unsecured priority claims of the IRS are paid in full. The penalties will be a portion of the unsecured creditor's class. The Plan describes, as of the date the Plan was calculated, the amount due the IRS on its priority unsecured claim. It will be paid as a portion of the $2,500.00 per month. It appears that any lien, pre-petition, covers certain assets. If the Service has a lien on collateral of value, the Service will maintain its lien in a value reduced by each payment, post confirmation. In order to resolve the correct value of the Services lien, further negotiation or other resolution of the lien value must occur.[3]

Attempts to reorganize proved unsuccessful, a plan was not confirmed and the case was converted to Chapter 7 on December 27, 2006.

At some point in 2006, NORTHWEST filed a state court action against the DEBTORS on fraud-related theories. In a separate suit, NORTHWEST sought to collect on the guarantees. On May 25, 2007, the parties entered into an agreed order and judgment. The

---

[3] An Amended Plan was filed on May 30, 2006, which provided the same treatment for the IRS claim.

4

consent judgment called for the DEBTORS to make monthly payments of $1,500 on the agreed amount of the indebtedness of $226,403.42, plus accruing interest, charges and fees, and provided as follows:

> As further consideration for the Plaintiff's acceptance of such installment payment plan, Defendants agree and confirm that the indebtedness reflected herein is derivative of the amounts due and owing in the companion case of NORTHWEST BANK & TRUST COMPANY vs. DANNY S. EDWARDS and DOROTHY E. EDWARDS No. 06 L 64 which is based on fraudulent and/or negligent misrepresentations by Defendants, which Defendants agree would be established by the evidence in [that case.] Specifically, Defendants concede that Plaintiff would be able to establish that Plaintiff loaned moneys to Defendants based upon Defendants use of statements, in writing, that were materially false, respecting the Defendants' financial conditions, upon which Plaintiff reasonably relied and upon which Defendants intended Plaintiff to rely. Based on the foregoing, Defendants agree that the judgment rendered herein is nondischargeable under 11 U.S.C. Section 523 in any bankruptcy proceeding either and/or both of them might file.

The DEBTORS filed a Chapter 7 petition on December 1, 2009. At the time the petition was filed, the DEBTORS had made payments to NORTHWEST of $35,000 on the judgment and the principal balance remaining under the consent order was $224,809.07, along with interest of $18,357.23 and attorney fees of $32,530.26. NORTHWEST filed an adversary complaint seeking a determination that the remaining balance is nondischargeable, based on the language of the consent decree. Alternatively, NORTHWEST alleges in its complaint that it is entitled to a determination that the debt is nondischargeable under section 523(a)(2)(B), by proving that the DEBTORS submitted false financial statements to NORTHWEST with the intent to deceive. At the pretrial conference held on July 19, 2010, the Court called the parties' attention to the Seventh Circuit's decision in *Klingman v.*

5

*Levinson*, 831 F.2d 1292 (7th Cir. 1987), requesting that they address its impact on this case. NORTHWEST filed a motion for summary judgment, contending that the consent judgment should be given preclusive effect in this nondischargeability proceeding and that the consent agreement demonstrates that there are no genuine issues of material fact. In response, the DEBTORS contended that the consent judgment failed to establish sufficient facts to support the section 523(a)(2)(B) claim.

This Court, in an Opinion and Order entered November 9, 2010, denied NORTHWEST'S motion for summary judgment, determining that the doctrine of collateral estoppel applied to preclude relitigation of the following issues, which the DEBTORS, in the consent judgment stipulated that NORTHWEST would be able to establish: that the financial statements were materially false; that the DEBTORS intended for NORTHWEST to rely on those statements; and that NORTHWEST reasonably relied on those statements. Because the consent judgment did not contain an unequivocal stipulation that the evidence would establish fraudulent misrepresentation, the issue of whether the DEBTORS intended to deceive NORTHWEST, that issue remained for trial.

The matter was tried on February 10, 2011. NORTHWEST filed a pretrial memorandum, asserting that the financial statement dated July 22, 2004, was false because it failed to disclose any tax liability for withholding taxes for employees of MY TYPE. The DEBTORS rightly noted, during their opening statement, that although the trial was limited to the issue of their intent, that issue could not be explored in isolation, but would require NORTHWEST to identify the false representations upon which it relied, because the

6

DEBTORS' intent to deceive is inextricably tied to those falsehoods.

Richard Blanche, the commercial loan officer at NORTHWEST who made the loans to the DEBTORS, testified that he had no personal knowledge of the DEBTORS' financial circumstances prior to meeting with them in the summer of 2004. Blanche testified that he relied on the information contained in the personal financial statement which the DEBTORS submitted in July, 2004. After obtaining approval of the loan committee, NORTHWEST made the following loans:

| DATE | BORROWER | AMOUNT | GUARANTOR |
|---|---|---|---|
| 2004 | | | |
| September 2 | DEBTORS | $235,000.00 | My Type, Inc. |
| September 2 | My Type, Inc. | 50,000.00 | DEBTORS |
| September 2 | My Type, Inc. | 210,000.00 | DEBTORS |
| September 3 | DANNY | 34,107.00 | My Type, Inc. |
| December 10 | My Type, Inc. | 50,000.00 | DEBTORS |
| December 31 | DANNY | 5,075.00 | My Type, Inc. |
| | | | |
| 2005 | | | |
| February 11 | My Type, Inc. | 50,000.00 | DEBTORS |
| March 11 | My Type, Inc. | 48,504.06 | DEBTORS |
| August 1 | My Type, Inc. | 150,000.00 | DEBTORS |

A second personal financial statement was submitted in May, 2005, in connection with a restructuring and consolidation of the two revolving lines of credit and the short term note. Neither financial statement disclosed any unpaid income tax of MY TYPE as a personal liability of the DEBTORS. Blanche testified that the loan would not have been made if NORTHWEST had been made aware of MY TYPE'S tax liability. On cross-examination, Blanche was unable to identify any false statement contained on the financial statements concerning any of the assets or liabilities disclosed. He conceded that the form

did not call for the disclosure of the liabilities of MY TYPE. Although he was aware of MY TYPE'S bankruptcy, he did not personally review any of the documents filed in that proceeding.

NORTHWEST'S credit analyst, who prepared the loan reports for both the initial loans and the refinancing which took place in August, 2005, also testified that she was unaware of MY TYPE'S tax liability. The senior loan officer echoed Blanche's testimony that the loans would not have been made if the tax liability had been disclosed.

Danny testified that during the period that the loans were made, he acted as the operations manager for MY TYPE. Although he occupied the office of Secretary/Treasurer, he testified that he was not involved with and was unaware of the company's finances. He testified that he was unaware of the tax lien before MY TYPE'S bankruptcy was filed. He denied that the personal financial statements contained materially false statements, but stated that he signed the consent judgment, at his bankruptcy attorney's advice, in order to "get the monkey off his back." DEBTORS argue that since Danny had no involvement with or knowledge of MY TYPE'S finances, he is not a "responsible person" and cannot be found liable.

Dorothy was the sole shareholder and President of MY TYPE. She was in charge of the business, effectively performing the duties of Chief Executive Officer. She did not, however, keep the books or perform accounting tasks. MY TYPE employed an on-staff bookkeeper, Linda Bettis, and an outside CPA, Dennis Voss, neither of whom testified.[4]

---

[4] Bettis died before trial.

The company also outsourced its payroll processing to Padgett Business Services, with whom Voss was associated. Padgett Business Services was responsible for properly calculating, accounting for and withholding the payroll taxes on a weekly basis. At the end of each quarter, Voss would prepare and file the 941 quarterly return and pay the accompanying tax liability.

Dorothy testified that Voss paid MY TYPE'S 941 taxes for the first quarter of 2004 in full, but the IRS, however, mistakenly refunded the entire amount. Dorothy stated that the IRS mailed the refund check to MY TYPE where it was received and processed by Bettis. Dorothy claimed to have been out of town when the money was refunded. She testified that she is not certain when she was made aware of the refund. She stated that she did not recall receiving any notice from the IRS about the liability and did not learn that the IRS had filed a notice of tax lien until after MY TYPE filed bankruptcy.

Dorothy insisted that when she became aware of MY TYPE'S payroll tax liability, it would have been disclosed on the corporation's financial statements. She testified that balance sheets and income statements for MY TYPE were prepared on a semi-annual or annual basis. She claimed not to review the bank statements on a regular basis, but relied on Bettis. No evidence was introduced about the execution or deposit of the refund check or the disposition of the funds. Dorothy testified that Voss was not made aware of the refund.

**ANALYSIS**

Section 523(a)(2)(B) provides that a debtor may not discharge a debt for property received by:

9

>   (B) use of a statement in writing–
>     (i) that is materially false;
>     (ii) respecting the debtor's or an insider's financial condition;
>     (iii) on which the creditor to whom the debtor is liable for such money . . . reasonably relied; and
>     (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). In order to prevail, a creditor must prove that the debtor provided a written statement (1) that is materially false; (2) respecting his financial condition; (3) upon which the creditor reasonably relied; and (4) with the intent to deceive. *In re Cohen*, 507 F.3d 610 (7th Cir. 2007). Each of these elements must be established by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The consent judgment entered by the parties in this case parrots the first three elements of section 523(a)(2)(B) and, under this Court's prior ruling, those factual allegations are established. The only element at issue is the DEBTORS' intent to deceive. Given the absence of a specific admission by the DEBTORS as to their intent to deceive, NORTHWEST is banking on the logical inference which may be drawn where "a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan." *See Matter of Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995). An intent to deceive may be inferred solely from the debtor's knowledge of the falsity of the financial statement. *In re Bryson,* 187 B.R. 939, 961 (Bankr.N.D.Ill. 1995). The requisite scienter may also be established by proof that the debtor published the statement with a reckless indifference or disregard for its accuracy. *Id.* The creditor has the burden

of proving evidence from which such an inference can be drawn. *In re Napier,* 205 B.R. 900, 907 (Bankr.N.D.Ill. 1997). The intent to deceive must have existed at the time of the submission of the false financial statement. *Id.*

While conceding that the personal financial statements did not require the DEBTORS to list MY TYPE'S liability for unpaid withholding taxes, NORTHWEST contends that the personal financial statement submitted by the DEBTORS on July 22, 2004, before any of the loans were made, was materially false because it omitted the DEBTORS' personal liability for MY TYPE'S employee withholding taxes.[5] Acknowledging that those taxes were assessed against MY TYPE on July 19, 2004, NORTHWEST maintains that the DEBTORS surely knew they were on the hook at the time they submitted the financial statement three days later and that their failure to include that liability renders their debt nondischargeable because an intent to deceive may be inferred from that knowledge.

Federal law imposes personal liability on those individuals whose control over the financial affairs of a business entity requires them to collect and pay over taxes withheld from employees. 26 U.S.C. § 6672. Section 6672(a) of the Internal Revenue Code provides:

> **(a) General rule. --** Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section

---

[5]In closing argument, NORTHWEST argued that the false statements at issue were not limited to the DEBTORS' personal financial statements, pointing to the loans made to MY TYPE. Though its representative recalled that the DEBTORS submitted documents regarding MY TYPE'S financial condition, none of those documents were introduced into evidence. Assuming that such documents exist in NORTHWEST'S loan file, any attempt to introduce them would likely have drawn an objection from DEBTORS' counsel as outside the scope of the complaint.

   6653 or part II of subchapter A of chapter 68 for any offense to which this section is applicable.

Contrary to NORTHWEST'S contention, the liability borne by a responsible person does not arise automatically upon nonpayment of 941 taxes.[6] Section 6672(b)(1) provides:

> **(b) Preliminary notice requirement. --**
>
>   **(1) In general. --** No penalty shall be imposed under subsection (a) unless the Secretary notifies the taxpayer in writing by mail to an address as determined under section 6212(b) or in person that the taxpayer shall be subject to an assessment of such penalty.

11 U.S.C. § 6672(b)(1).

  The issue of whether the nonpayment of the taxes was willful is complicated by the fact that the taxes were initially paid in the ordinary course of MY TYPE'S business. Only because the IRS issued a refund in error was the paid status reversed. The effect of this unusual circumstance on the liability of the responsible persons is unclear. In fact, the claim filed by the IRS in the DEBTORS' case reflects liabilities for civil penalties assessed against only Dorothy, on February 20, 2006, for interest in the amount of $36,988.99, for the tax period ending March 31, 2004, and for interest in the amount of $10,497.57, for the tax period ending June 30, 2005.

  The erroneous IRS refund makes this an unusual case. Until the DEBTORS became

---

[6] In *Adams v. U.S.*, 504 F.2d 73, 75 (7th Cir. 1974), the court discussed the attributes of a "responsible person," stating:

> The "person" who is responsible for the payment of corporate taxes within the meaning of § 6672 is that individual who has the final word as to what bills should or should not be paid, and when. *Turner v. United States*, 423 F.2d 448, 449 (9th Cir. 1970). In this context, the word "final" means significant rather than exclusive control over the disbursal of funds. *Dudley v. United States*, 428 F.2d 1196, 1201 (9th Cir. 1970). Moreover, although the liability for failure to collect, account for, and pay over withheld taxes usually attaches to those high corporate officials who have the power and responsibility within the corporate structure for seeing that taxes withheld from various sources are remitted to the government, *Monday v. United States*, 421 F.2d 1210, 1214 (7th Cir. 1970), the party subject to the penalty for the corporation's failure to pay the taxes due is not always or necessarily an official of the delinquent corporation. *McCarty v. United States*, 437 F.2d 961, 967, 194 Ct.Cl. 43 (1971).

aware of the refund, the fact that it was issued in error and the fact that it rendered the 941 taxes unpaid, they would not have been aware of the responsible person liability or even the possibility thereof. So in order to prove that the DEBTORS had an intent to deceive when they submitted the first financial statement on July 22, 2004, NORTHWEST must prove those underlying facts.

Danny was asked almost nothing about the issue of his knowledge. His only relevant testimony was that he did not learn of the notice of the IRS tax lien until after MY TYPE'S bankruptcy filing on June 30, 2005. There is no evidence in the record to support a finding that Danny knew of the refund, knew that it was an error, and knew of the continuing tax liability at any time prior to July, 2005. There is no evidence that the IRS ever assessed responsible person liability against him. Neither is there any evidence of when he learned that Dorothy had been assessed liability as a responsible person.

NORTHWEST'S questioning of Dorothy was only slightly more pointed. Echoing her husband's mantra, she testified that she was unaware that the IRS had filed a notice of tax lien until after MY TYPE'S bankruptcy filing. She testified that she did not become immediately aware of the refund because she was out of town when it was received by Bettis. Dorothy was not asked when or how she first became aware of the refund or what, if anything, she did when she learned of it. She was not asked when she first became aware that the 941 taxes were still owed by MY TYPE. She was not asked about how the refund check was processed or by whom.

Rather than asking these questions directly, and perhaps getting unfavorable answers from Dorothy, NORTHWEST argues that the Court may infer Dorothy's

13

knowledge and intent from other facts that are not in dispute. The requested inferences, however, are a bridge too far. It may seem reasonable to presume that a small company's CEO would be made immediately aware of the receipt of a large check from the IRS, that she would make a diligent inquiry into the reasons for its issuance, and that she would direct the deposit and disposition of the funds. It may also seem reasonable to presume that a company's bookkeeper would bring the receipt of such a check to the attention of the CEO. But Bettis never testified (she is deceased) and Dorothy was never asked those obvious questions. To buy what NORTHWEST is trying to sell, the Court would have to infer that Bettis engaged in certain conduct (telling Dorothy about the check) solely from her status as bookkeeper, and that Dorothy then engaged in certain conduct (making certain inquiries) solely because of her status as President. In this Court's view, drawing an inference that a person took certain actions on a specific occasion in response to a specific event is dicey at best, amounting to little more than speculation.[7] And in this case, Dorothy's conduct is dependent on the inference about Bettis's conduct. That is one inference too many.

It is possible that Bettis failed to tell Dorothy about the check. Based on the evidence in the record, there is no proven fact from which it may be inferred, as more likely than not, that Bettis told Dorothy about the IRS refund at any time, much less prior to July 22, 2004. Dorothy said she was "out of town." Was she 30 miles away or 3,000? Was she gone for two days or two months? Was Bettis authorized to endorse checks on behalf of MY TYPE?

---

[7] No evidence of habit or routine practice was offered. *See* Fed. R. Evid. 406.

14

Was the check deposited into MY TYPE'S account or someone else's? Facts that might have provided a circumstantial basis for inferring Dorothy's knowledge are missing. The questions of what did Dorothy know and when did she know it were never answered.

Even if Dorothy knew of the refund check as of July 22, 2004, knew that it was issued in error, knew that it resulted in the 941 taxes for the first quarter of that year being unpaid, and knew of the potential for personal liability, the IRS'S assessment of her personal liability did not occur for another 19 months. According to the proof of claim (No. 27-1) filed by the IRS in the DEBTORS' bankruptcy case, the "responsible person" liability was assessed against Dorothy on February 20, 2006. (It was assessed only against her, not Danny.)

An assessment under section 6672(a) serves as an assertion of personal liability, but is subject to rebuttal by evidence that she was either not a "responsible person" or that she did not act "willfully" in failing to discharge her duties as a responsible person. *Bell v. U.S.,* 355 F.3d 387, 393 (6th Cir. 2004). Willfulness is established where a responsible person makes a deliberate choice to voluntarily, consciously and intentionally pay other creditors rather than make the tax payments. *Collins v. U.S.,* 848 F.2d 740, 742 (6th Cir. 1988). Although the omission of known contingent liabilities may render a financial statement materially false, *In re Martin,* 299 B.R. 234 (Bankr.C.D.Ill. 2003), *aff'd,* 306 B.R. 591 (C.D.Ill. 2004), as discussed above, the potential responsible person liability here is clouded because of the mistaken refund. Personal liability was never assessed against Danny and was only assessed against Dorothy long after the submission of the financial statements.

The same infirmity exists as to the second financial statement, signed only by Dorothy on May 19, 2005, about six weeks before MY TYPE filed its Chapter 11 petition on June 30, 2005, and nine months before the IRS assessed the responsible person liability against Dorothy.  No evidence was introduced as to Dorothy's state of mind on May 19, 2005.  She may or may not have believed, as of that date, that she was personally liable for the 941 taxes, a question that is complicated by the erroneous refund.  There is simply not enough evidence in the record to permit the Court to conclude that she was aware on May 19, 2005, of her personal liability for the 941 taxes and intentionally omitted that liability from the financial statement in an effort to deceive NORTHWEST.

NORTHWEST has failed to prove that the DEBTORS had the necessary intent to deceive. Judgment will be entered for the DEBTORS. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate Order will be entered.

###